# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER L. SNOW, a Minor by and through his Guardian ad Litem, PAULA GRISWOLD; TANYA SNOW, an individual; and TIMOTHY SNOW, an individual,<br><br>               Plaintiffs,<br>  vs.<br>UNITED STATES OF AMERICA,<br><br>               Defendant. | CASE NO. 09CV0679-LAB (WMc)<br><br>**FINDINGS OF FACT, AND VERDICT** |

      Plaintiffs Christopher, Tanya, and Timothy Snow brought this medical malpractice action under the Federal Tort Claims Act (FTCA). They allege that during labor and delivery at the Naval Medical Center, San Diego (NMCSD), medical personnel failed to act within the standard of care, resulting in injuries to Christopher Snow. The two specifically identified medical personnel are Nurse Midwife Elizabeth Schwartz and Dr. Thomas Gaylord, an OB-GYN who oversaw portions of the labor and who delivered Christopher Snow by Caesarean section. The complaint alleges that Christopher Snow now suffers from cerebral palsy and other disorders as a result of his injuries.

      The Court held a bench trial. After hearing evidence from both parties, reviewing the briefing supporting the parties' closing arguments, then hearing closing arguments, the Court now makes its findings of fact and renders its verdict. As discussed more fully below, the

Court finds the medical personnel at NMCSD acted within the appropriate standard of care. The Court therefore does not reach the question of causation, and the question of damages need not be tried.

**I.     Discussion**

Under the FTCA, the United States can (within certain limits) be sued to the same extent as a private individual could be. 28 U.S.C. § 2674. Where, as here, plaintiffs bring their claims under the FTCA, the Court applies the law of the state in which the alleged tort occurred. *See Toomer v. United States*, 615 F.3d 1233, 1239 (9th Cir. 2010). Here, that means the Court applies California law.

"In California, medical personnel are held in both diagnosis and treatment to the degree of knowledge and skill ordinarily possessed and exercised by members of their profession in similar circumstances." *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir. 1988). Except where medical treatment required is within the common knowledge of laypeople, the standard of care must be proved by expert testimony. *Id*. Plaintiffs must prove by a preponderance of the evidence that Defendant's medical personnel failed to act with the required medical standard of care, and that their negligence caused Christopher Snow's medical disorders. *See Woods v. United States*, 720 F.2d 1451, 1452 (9th Cir. 1983) (citing trial court's findings).

**A.     Evidence of Standard of Care**

Here, Plaintiffs offered the testimony of Dr. Barry Schifrin concerning the labor and delivery. (Plaintiff's other expert witnesses testified concerning injury and causation.) His testimony focused on available measurements which, he concluded, a competent OB-GYN would know that the labor was not progressing normally and the baby was in peril. His testimony focused on the fetal heart monitor tracings and what they showed concerning possible danger to the baby. Dr. Schifrin in detail discussed his interpretations of the fetal monitoring strips beginning at page 3011, continuing through page 3013, then moving to page 3018 and finally page 3025; shortly after this, the decision to perform the C-section was made.

Dr. Schifrin, referring to page 2971 of the tracings, identified the baby's base heartrate as being 150, and used this as the reference when discussing whether the heartrate had returned to normal after contractions. Beginning at page 3011 (approximately 5:22 a.m.), he identified diminished variability. Looking at the monitoring strip, he testified that it demonstrated interference with blood flow and lack of availability of oxygen.

In the next tracing (covering roughly 5:30 to 5:38 a.m.), he testified there was no return to the baseline between four contractions, that this was not caused by medication, and that After that, he identified a failure of the baby's heart rate to return to the baseline between contractions. He testified this was not caused by medication, and that (around 6:00 a.m.) there was a need to deal with decelerations. Terbutaline was administered, which helped reduce uterine activity, but he testified the tracings showed the baby was not recovering between contractions. At this point, the heart rate went up to 180.

Beginning on page 3025 of the tracings, Dr. Schifrin identified decelerations, then persistent deceleration on page 3026. Shortly after this, he testified, the decision was made to delivery the baby by C-section. In his opinion, this decision was made about an hour too late. He believes the baby sustained an injury around 7:15 a.m.

Plaintiffs' evidence also suggested that the baby was not descending through the birth canal normally, and remained at station -2 from approximately 4:00 until 7:15 a.m. Progress of one centimeter was noted, which their witnesses attributed to swelling of the baby's head. After delivery, however, the baby's fontanelles were soft and flat, with no evidence of swelling. Dr. David Miller testified for the Defendant that there was no significance to the baby's not descending until the second, active stage of labor, and that no medical authority teaches that head compression warrants intervention.

On the stand, Dr. Miller reviewed pages 3009 through 3026, reaching different conclusions than Dr. Schifrin. Beginning at page 3009, he testified the tracings, including variability, were within the normal range. Beginning at page 3013, he said nothing would have prevented a doctor from calling for a C-section, though it was not required. Reviewing pages 3014 through 3024, he testified the labor appeared to be progressing normally, and

the baby appeared healthy. He had no concern for the baby's health based on these tracings. Beginning on page 3024, however, he identified some variation between decelerations and normal variability. Then on page 3025 (7:14 a.m.), with the mother dilated to 9 cm and the baby at -1 station, he said it would be appropriate to carry out a C-section quickly, but not on a "crash" basis. Based on the tracing at page 3026, he said the C-section should have been done "as rapidly as safely possible," which appears to have been what was actually done. He also testified he thought the care given in this case was very good.

Obviously, Dr. Schifrin's testimony concerning the interpretation of the tracings and the descent of the baby through the birth canal conflicts with Dr. Miller's. Both witnesses' testimony on these points was coherent and credible. To be clear, the mere existence of a conflict of opinion between the witnesses does not require a finding for the defense. Obviously, one expert's opinion could correctly represent the standard of care, while another's beliefs might not. The problem for Plaintiffs, however, is that while Dr. Schifrin testified in detail concerning why he thought the data showed the baby was in danger, he never testified that the standard of care would have required a competent OB-GYN or other medical personnel to interpret the data as he did. Moreover, it appears unlikely he could so testify. He acknowledged, for example, that the Council on Resident Education in Obstetrics and Gynecology (CREOG) disagreed with him, that CREOG was of the opinion that early decelerations were benign, and that according to CREOG fetal heart monitoring was not predictive of injury. Dr. Schifrin agreed such monitoring does not determine whether injury has occurred, but disagreed with CREOG, testifying that fetal monitoring can be predictive of injury.

In short, no evidence establishes that Dr. Schifrin's interpretation would be regarded as standard, and Dr. Miller's as exceptional or unreliable. If anything, the evidence is to the contrary: On the points he testified about, Dr. Schifrin appears to be a maverick within the medical community. There is no evidence his views on the matters he testified about accurately reflect the accepted standard of care. *See Hutchinson*, 838 F.2d at 392 (discussing standard of care).

This is not to say Dr. Schifrin's views are wrong; it is possible they may some day come to be accepted as correct, and become standard. But it is not for this Court to make such a finding in the first instance and hold Defendant retroactively responsible. Because Dr. Miller's testimony appears to represent the standard medical interpretation, or at least interpretations that fall within the accepted range, the Court cannot find the medical services at issue here fell below the standard of care.

### B.     Secondary Evidence: What the Medical Personnel Thought

As secondary evidence, Plaintiffs offered four pieces of evidence suggesting that the medical personnel thought the situation was more serious than they were willing to admit, or that it had been mishandled. For reasons discussed below, the Court finds this evidence unconvincing.

#### 1.     Whether a C-Section Was Scheduled

Tanya Snow, Tim Snow, and Paula Griswold testified that Ms. Snow was initially either scheduled to have a C-section or told a C-section was appropriate because of the baby's size, but when she arrived at the hospital no provisions for a C-section had been made and she was allowed to go into labor. None of them questioned this at the time.

While the Court accepts that a C-section might have been considered earlier, or that it might have been suggested or recommended, it was never scheduled. Instead, Ms. Snow was assigned a nurse-midwife and allowed to begin labor. Even assuming a C-section was thought appropriate at some point, it is clear from the medical records and other evidence that the prenatal care-givers had changed their minds many days before Ms. Snow entered the hospital to give birth. In fact, Ms. Snow was in false labor for two days, so if a C-section had been considered necessary, either the Snows or any of the medical personnel had ample time to request it.

#### 2.     "Crash" C-section

Paula Griswold testified that at some point while Ms. Snow was in labor, possibly around 7:30 a.m., Dr. Gaylord exclaimed "We have two minutes or we're going to lose them both," which she understood to mean both mother and baby were in danger. Medical

personnel then unplugged the fetal monitors, began quickly putting equipment onto the bed where Ms. Snow was lying, and quickly wheeled her (in her bed) to the delivery room. Ms. Snow, though she was under the influence of medication at the time, recalled similar events. She has only hazy memories of the delivery itself. Mr. Snow was not in the room, but was told to put on scrubs and go to the delivery room, which he did quickly. He testified the medical personnel appeared to be in a hurry to get his wife ready for the C-section.

While Ms. Griswold was certain Dr. Gaylord had made such a remark, Dr. Gaylord testified he never said anything like this. He testified that such a remark would have been highly unusual and he would have remembered making it. Instead, he testified (without objection) that he believed someone in the room may have made the remark that two personnel would be lost due to a shift change if the C-section wasn't begun quickly.

Dr. Gaylord also distinguished between an "emergency" C-section (unplanned and performed reasonably quickly) and a "crash" C-section (urgent, and performed as quickly as possible). He testified this C-section was the former, not the latter. While other witnesses questioned whether there was any distinction between a "crash" and an emergency C-section, the factual background tends to corroborate Dr. Gaylord's explanations. Even assuming Christopher Snow's life was in immediate danger, there is no evidence anyone thought Tanya Snow's life was equally in danger. There would thus have been no reason why Dr. Gaylord or anyone of the other medical personnel would have said so. In addition, the evidence suggests no one thought a C-section had to be performed within two minutes; in fact, it was completed approximately 20 minutes later. The Court finds the remark about "two minutes or we're going to lose them both" therefore cannot reasonably have referred to mother and baby.

### 3.    NICU Personnel

Plaintiffs point out the Neonatal Intensive Care Unit (NICU) staff was in attendance, and they argue this meant the medical personnel knew they had made some kind of error and expected Christopher to be born injured. Dr. Gaylord referred to these personnel as the high-risk team. No evidence was offered to show that the presence of NICU personnel

means medical personnel have made an error. The explanation that their presence was precautionary appears reasonable, and has not been seriously challenged.

### 4. Treatment Early in Labor

Dr. Schifrin pointed out Nurse-Midwife Schwartz had taken steps to slow labor. In his view, this showed she and Dr. Gaylord (whom she was consulting) knew the baby was in distress. Dr. Miller characterized these as conservative measures, and this appears to be a reasonable explanation. Even accepting this as true, it is unremarkable. The evidence makes clear that mother and baby were being monitored so that labor could be managed, which is what was happening. There is no reason to interpret these measures as expressions of alarm.

## C. Causation

Because the Court finds Defendant's medical personnel met the standard of care, it need not reach the question of whether the disorders Christopher Snow suffers from were caused by anything they did wrong. It is, however, worth noting that this is not a case where the nature of injuries bespeaks medical negligence. *See, e.g., Zavala v. Board of Trustees,* 16 Cal. App. 4th 1755, 1764–65 (Cal. App. 6 Dist. 1993) ("The doctrine of res ipsa loquitur is applicable only where the injury upon which the action is based is of the kind which ordinarily does not occur in the absence of negligence.") (citing *Ybarra v. Spangard*, 25 Cal.2d 486, 489 (1944)). Dr. Ronald Gabriel, for example, testifying for Plaintiffs, said cerebral palsy can be caused by a number of things, and that distress during birth is only one possible cause.

## III. Conclusion and Order

Because Plaintiffs have failed to prove by a preponderance of evidence that Defendant breached the standard of care, the Court renders its verdict in favor of Defendant.

///

///

///

///

Defendant shall promptly submit a proposed order and judgment, in accordance with this District's Electronic Case Filing Administrative Policies and Procedures Manual, § 2(h).

**IT IS SO ORDERED**.

DATED: September 23, 2011

*[signature: Larry A. Burns]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge